**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**WILLIAM THOMAS, Administrator
of the Estate of Destin Thomas, Deceased,**

        **Plaintiff,**                    **Case No. 2:14-cv-906**
                                        **JUDGE GREGORY L. FROST**
     **v.**                             **Magistrate Judge Elizabeth P. Deavers**

**CITY OF COLUMBUS, et al.,**

        **Defendants.**

<u>**OPINION AND ORDER**</u>

This matter is before the Court for consideration of the following filings:

(1) a motion for summary judgment (ECF No. 32) filed by Defendants the City of

Columbus, Columbus Chief of Police Kimberley Jacobs, and Officer William T. Kaufman;

(2) a memorandum in opposition (ECF No. 36) filed by Plaintiff, Damon D. Terry;

(3) a reply memorandum (ECF No. 37) filed by Defendants;

(4) a surreply (ECF No. 40) filed by Plaintiff; and

(5) a response to the surreply (ECF No. 41, Ex. A) filed by Defendants.

For the reasons that follow, the Court **GRANTS** Defendants' motion in regard to Plaintiff's

federal claims and **DISMISSES WITHOUT PREJUDICE** Plaintiff's state law claims.

**I.  Background**

On July 17, 2012, at approximately 8:45 a.m., Destin Thomas called 911.  Thomas told

the emergency dispatcher that he heard multiple individuals breaking into his apartment and that

he was in his bedroom.  The emergency dispatcher aired an alert tone for a burglary in progress,

and various Columbus police officers began to respond to the call.

1

Defendant William Kaufman arrived first at the apartment complex, within three minutes of the dispatch.  Rather than waiting for backup, the solo Kaufman exited his police cruiser, unholstered his gun, and began running toward the apartment's only entranceway and exit. Kaufman heard voices coming from the area of a breezeway, and just as he approached the breezeway he saw two men running directly at him.  Kaufman asserts that the first runner had a gun in his right hand, which he lifted and pointed directly at Kaufman.  Ten feet separated the men.  Kaufman yelled, "Hey" and fired two shots.  Both shots hit the first runner, who fell to the pavement.  The first runner was Destin Thomas.  Thirteen seconds had elapsed since Kaufman arrived at the apartment complex.  Kaufman pursued the second runner for a few feet, but then let the man go and returned to Thomas.  Kaufman called for a medic, but Thomas did not survive.

On July 17, 2014, Plaintiff, William Thomas, Destin Thomas' father and the administrator of his son's estate, filed this civil action against Defendants the City of Columbus, Columbus Chief of Police Kimberley Jacobs, and Officer William T. Kaufman.  (ECF No. 1.) Plaintiff asserts two federal claims against Kaufman under 42 U.S.C. § 1983, one for excessive use of force and one for deliberate indifference to serious medical needs.  Plaintiff also asserts two § 1983 claims against the City of Columbus and Jacobs in her official capacity, one for failure to train and for having customs, policies, or practices causing constitutional violations and one for ratification.  Finally, Plaintiff asserts state law claims against all the defendants for assault and battery, intentional infliction of emotional distress, and wrongful death.  Defendants have filed a motion for summary judgment on all of the claims.  (ECF No. 32.)  The parties have completed briefing on the motion, which is ripe for disposition.

2

## II.  Analysis

### A.  Standard Involved

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial.  *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "  *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

### B.  Discussion

#### 1.  *Excessive force claim*

Kaufman seeks summary judgment on Plaintiff's § 1983 excessive force claim.  Section

1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Thus, in order to assert a valid § 1983 claim, Plaintiff must show that, while acting under color of state law, Kaufman deprived Destin Thomas of a right secured by the Federal Constitution or laws of the United States. *See Alkire v. Irving,* 330 F.3d 802, 813 (6th Cir. 2003).

Kaufman moves for summary judgment on the grounds that the amount of force involved here was reasonable, thereby precluding any deprivation of a constitutional right, and on the grounds that he is entitled to qualified immunity. The qualified immunity doctrine, under certain circumstances, operates to shield from civil liability governmental officials, such as police officers, who are performing official duties. *Sinick v. County of Summit*, 76 F. App'x 675, 678-79 (6th Cir. 2003). This affirmative defense is meant to safeguard an official's proper decision making process and offers that party potential relief from frivolous suits. *See D'Agastino v. City of Warren*, 75 F. App'x 990, 993 (6th Cir. 2003). The Sixth Circuit has explained that qualified immunity "shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Id*. (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In addition to shielding officials from liability, qualified immunity may entitle the official to not stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

4

In addressing the potential applicability of qualified immunity, "the court considers whether, on the plaintiff's facts, there has there been a violation" and "whether that violation involved 'clearly established constitutional rights of which a reasonable person would have known.' "  *Hoover v. Radabaugh*, 307 F.3d 460, 465 (6th Cir. 2002) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996).  *See also Saucier*, 533 U.S. at 201; *Davenport v. Causey*, 521 F.3d 544, 550 (6th Cir. 2008).  This analytic approach has also been characterized as a three-part inquiry in which a court must ask:

> 1) has a constitutional violation occurred; 2) was that right a clearly established right of which a reasonable person would have known; and 3) has the plaintiff alleged sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights"?

*Id*. at 679 (quoting *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc)).  *See also Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991) ("A public official is entitled to qualified immunity for conduct in performing discretionary functions so long as that conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known").

The doctrine of qualified immunity thus recognizes that a police officer can be found to have violated the constitution, but be granted immunity for *reasonable* mistakes as to the legality of his or her action.  *Saucier*, 533 U.S. at 206.  The reasonableness of such mistakes is inherently dependant upon the clarity of the legal constraints governing particular police conduct.  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  *Id*. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

In determining whether a defendant is entitled to qualified immunity, "[t]he ultimate

5

burden of proof is on [the plaintiff] to show that [the defendants] are not entitled to qualified immunity." *Wegener*, 933 F.2d at 392. *See also Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (6th Cir. 1992). Further, "[w]hen ruling on qualified immunity, the district court should indicate the clearly established right at issue and the factual basis for its conclusion that a genuine issue exists as to the commission of acts violating that right." *Wegener*, 933 F.2d at 392 (citing *Poe v. Haydon*, 853 F.2d 418, 423-24, 426 (6th Cir. 1988)).

The Court will therefore begin its analysis by examining whether a constitutional violation has occurred. Prior to the events underlying this case, the United States Supreme Court established that the use of force is unconstitutional if it is excessive under objective standards of reasonableness. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). It was settled that at the time of the underlying events here that the use of force must be reasonable; if no deadly force was required, then no deadly force was necessary. *See id.* at 394; *Monday v. Oullette*, 118 F.3d 1099, 1104 (6th Cir. 1997) (citing *Adams v. Metiva*, 31 F.3d 375, 384-85 (6th Cir. 1994)).

A great deal of discretion is afforded police officers when evaluating reasonableness in such situations so that "[i]f the officer's mistake as to what the law requires is reasonable . . .[he] is entitled to the immunity defense." *Magrum v. Meinke*,  332 F. Supp. 2d 1071, 1078 (N.D. Ohio 2004). *See also Greene v. Barber*, 310 F.3d 889, 894 (6th Cir. 2002) ("A police officer may be entitled to qualified immunity, obviously, even though he has in fact violated the plaintiff's rights; 'reasonable mistakes can be made as to the legal constraints on particular police conduct.'" (citations omitted)).

Accordingly, to determine whether qualified immunity applies, this Court must determine whether the officer defendants' conduct was reasonable. Courts have indicated the

6

difficulty of this determination, stating that

> ascertaining the reasonableness of force used is not capable of precise definition or mechanical application, [and] the analysis focuses on the specific facts of each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight."

*Magrum*, 332 F. Supp. 2d at 1078 (quoting *Graham*, 490 U.S. at 396). The *Magrum* court then explains that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

Thus, a determination of whether the amount of force used was unreasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Ewolski v. City of Brunswick*, 287 F.3d 492, 507-08 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396). *See also D'Agastino*, 75 F. App'x at 994. The "objective reasonableness standard" applied in this inquiry asks whether a reasonable officer would conclude that the level of force used was appropriate. *Graham*, 490 U.S. at 396-97. This standard balances the cost to the individual against the government's interest in effectuating a seizure; it contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case. *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002) (citing *Graham*, 490 U.S. at 396 ).

Given the foregoing and cognizant of the applicable summary judgment standard that controls today's analysis, this Court must agree with Kaufman that no constitutional violation

occurred and that he is entitled to qualified immunity.  This is because there is no genuine issue of material fact as to whether Thomas had a gun and pointed it at Kaufman.

Plaintiff attempts to create a genuine issue of material fact on this point in three basic ways.  None succeed.

Plaintiff's first attempt to create a genuine issue of material fact argues that Kaufman has a strong motivation to lie.  The mere possibility of a defendant (or plaintiff) lying is true in every case, however, and falls squarely within the category of useless and irrelevant metaphysical doubt or speculation as opposed to a fact arising from evidence.  *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586 (explaining that a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (a party opposing summary judgment "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment" (internal quotation marks omitted)).  Plaintiff has failed to direct this Court to any evidence whatsoever raising even a reasonable inference that Kaufman is lying.

Plaintiff's second attempt to create a genuine issue of material fact relies on the testimony of Roy Taylor.  In his deposition, Taylor testified that his areas of expertise are "law enforcement training in use of force, law enforcement officer retention, hiring and administration," as well as "[l]aw enforcement procedure."  (ECF No. 35-7, at Page ID # 622-23.)  He testified that, in his opinion, Kaufman's use of deadly force was objectively unreasonable.  Taylor based this opinion on a variety of factors, including the fact that he believes that an officer cannot assume that someone running toward him with a gun is

necessarily a suspect.  Taylor testified that he had no reason to doubt or challenge the

proposition that Kaufman had observed Thomas holding a gun.  He did, however, disagree with

the proposition that Thomas pointed the gun at Kaufman:

> Q.  Is there any reason that you left out the fact known to Officer Kaufman
> that the gun was raised and pointed at him?
>
> . . .
>
> A.  The reasons that I believe Officer Kaufman shot the subject in the hip was
> because the weapon was down.  It's been very well documented that in use fo force
> situations that people focus on what's going to do the harm, so Officer Kaufman was
> focusing on that pistol and fired.  And based on that first round's impact – because
> he's already got his weapon out so there's no reason that that weapon would have
> been pointed down at the hip except that he's looking at the gun and he fires trying
> to strike the weapon and that where the first round came.  Then as Destin closes
> distance he raised the pistol up and fired about three feet away causing the fatal
> injury.

(ECF No. 35-7, at Page ID # 643.)  After providing this testimony, Taylor testified that he was

not a forensics expert and was providing no opinion in forensics, that he was not a ballistics

expert and was providing no opinion on ballistics, and that he did no testing to determine how

and where the bullets were fired.

Taylor then testified as follows:

> Q.  Okay.  But my question was, Mr. Taylor, is there any reason you left out
> Officer Kaufman's -- the fact that Officer Kaufman presents that the pistol in the
> right hand of the first person running from the apartment was raised and pointed
> towards him?  Why did you leave that out of your assumed facts?
>
> . . .
>
> A.  I believe the statement is incredulous.
>
> Q.  Okay.  So tell me what evidence you have – because I'm just trying to find
> out.
>
> A.  Sure.

Q.  Do you have any evidence or are you aware of any evidence, physical, statements, what you've been told,  anything that would even suggest that the gun was not raised and pointed towards Officer Kaufman when he fired?

A.  Yes.

Q.  What is that?

A.  That -- again, one of the things that happens in a use-of-force confrontation is that people will focus on the weapon that's going to do them harm, whether it's a pistol, a knife, a club, and they will unconsciously actually shoot at what they're focused on.  Instead of focusing center mass like we teach them they will focus on the weapon.  I can tell you when doing simunitions [*sic*] training with basic law enforcement students where we're doing force on force how many times I've been shot in the hand or the weapon I've been holding has been shot as the use of force situation unfolds because that's what they're focusing on and they get tunnel vision and unconsciously are shooting.

I believe that because of the location of the pistol is why that first round struck Destin in the hip.  It struck him on the right side.  So Kaufman is focused on that pistol and fires because that's where he's looking and that's why the first round struck Destin where it did.

Q.  And is that the only basis that you believe that it didn't happen the way Officer Kaufman says that a gun was pointed at him?

A.  That.  And the other is that Kaufman said that the pistol was down by his side and even though this person is running full bore that he's not pumping his arms. That is incredulous to me as well.  I am a runner and I know that it would be very difficult for me to run full speed with my hand down by my side.  So I find that's an incredulous statement as well.

Q.  You disbelieve but you have no physical or forensic or ballistic evidence to support your disbelief?

. . .

A.  Other than the round striking his hip instead of  being a center mass shot like he was trained to do.

Q.  You haven't talked to Officer Kaufman about where he was aiming?

A.  No.

10

Q.  You have no idea, do you?

A.  Only by the evidence.

Q.  Well, the evidence -- you don't know where his gun was pointed when he fired, do you?

A.  He said it was out of his holster.  Where would it be pointed?  I mean, a police officer is trained to shoot center mass so he should have been aiming at the center part of his chest.

Q.  Let me make sure I understand this.  You believe that since the – you believe – your belief is that he was focused on the hip area --

A.  Well, he's focused --

Q.  – where the gun was and that's the only reason you believe that it's incredulous that the gun was not raised or pointed?

. . .

A.  Yes.

(ECF No. 35-7, at Page ID # 644-47 (objections omitted).)  Taylor later testified that based on the autopsy results and crime scene photos, he believed that the first shot struck Thomas in the hip.  Taylor testified that this was his belief, but that he was not offering an opinion on that contention.

Under additional questioning, Taylor also testified several times that if Thomas had pointed the gun at Kaufman, or even started to move the gun toward Kaufman, then Kaufman would have been reasonable in responding with deadly force.  He summarized his ultimate opinion as follows, based on his belief that Thomas did not point the gun at Kaufman:

Q.  Is it your opinion that Officer Kaufman just ran on the scene without any information whatsoever and shot a person for no reason?

A.  Yes.

11

(ECF No. 35-7, at Page ID # 666-67.) Taylor also testified that he believed that Kaufman was lying about what had happened to cover Kaufman's mistake. He explained in subsequent testimony that he believed Kaufman "acted prematurely and he had to come up with a reasonable story to keep him from being criminally charged or terminated from his position for bad, you know, use of judgment." (ECF No. 35-7, at Page ID # 740.) In other words, according to Taylor, Taylor "believe[s] [Kaufman] saw a gun and he shot. The gun wasn't pointed at him. Oh, shit, here's a guy with a gun. Bang and it's too late." (ECF No. 35-7, at Page ID # 741.)

Much of Taylor's other testimony, not reproduced herein, addressed what he opined were multiple violations of the police department's standard operating procedures. But Taylor also correctly explained that these procedures are not constitutionally mandated, with the extant constitutional issue being simply the reasonableness of the use of deadly force. None of Taylor's testimony presents a genuine issue of material fact regarding this ultimate constitutional issue.

No reasonable factfinder could come to any conclusion other than that Kaufman disregarded numerous department policies and procedures. But these violations–some arguably and possibly inexplicably careless, others perhaps more understandable or even justified–do not present a constitutional issue. What matters is whether the evidence presents even an inference of a constitutional violation. It does not.

Kaufman had a reasonable basis to believe that Thomas presented a risk of serious physical harm. Taylor's rejection of this conclusion is based essentially on pure speculation; he disbelieves Kaufman based on assumptions and not based on evidence. Some of these assumptions are even based on underlying assumptions. For example, Taylor assumes that the

first bullet hit Thomas in the hit, and from that first shot hitting Thomas in the hip, Taylor extrapolates that Thomas was carrying the gun down at his side and not pointed at Kaufman. This is pure conjecture. The fact that Taylor does not believe Kaufman is not a factual dispute; a "[n]onmoving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible." *Cosmas v. Am. Exp. Centurion Bank*, 757 F. Supp. 2d 489, 493 (D.N.J. 2010). Instead, the evidence shows that Thomas did point a gun at Kaufman, and Taylor's rejection of this evidence is precisely the sort of "metaphysical doubt as to the material facts" that the Supreme Court has explained is insufficient to defeat summary judgment. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586.

Plaintiff's third attempt to create a genuine issue of material fact relies on the testimony of Scott Roder. Roder explained at his deposition that he has been previously qualified as an expert in forensic animation, although he explained he is not a forensic scientist.[1] He testified that he was not offering an expert opinion in this case, but that he was "demonstrating the physical evidence through [a] 3D computer-generated crime scene." (ECF No. 35-8, at Page ID # 757.) Roder then proceeded, essentially, to offer an opinion on the central issue in this case, specifically, whether Thomas pointed a gun at Kaufman.

Roder's animation never included Thomas holding a gun. He conceded during his deposition, however, that Thomas had indeed held a gun at some point:

> Q. Okay. To the left of the screen is a blue image. Do you see that?
>
> A. Yes.

---

[1] Technically, this Court should not consider the Roder deposition transcript filed with this Court because the reporter certification page (ECF No. 35-8, at Page ID # 860) is unsigned. *See Weimer v. Honda of Am. Mfg., Inc.*, No. 2:06-cv-844, 2008 WL 2557252 (S.D. Ohio June 23, 2008) (collecting cases supporting rejection of uncertified transcript).

Q.  And as I understand it, that blue image depicts Destin Thomas running from the apartment; am I correct?

A.  Yes.

Q.  And you know that Destin had a gun in his hand at that point, correct?
A.  At that point, yeah, I would say so.

Q.  Where is the gun in his hand in this image?

A.  It's -- I don't believe he -- I'm trying to see if there's actually one in his hand.  In this image I don't believe there is one in his hand.  It's kind of obscured by that tree there.  Let me see if I can rotate a little better.

There is no gun in his hand in this particular modeling sequence, but it would be accurate to say that he would have had a gun in his hand at some point after exiting his apartment.

Q.  Did you say he wouldn't have?

A.  No, I said he would.  Would.

Q.  Okay.  Let me have you do this: You go through your DVD, your entire animation, and let me know where that animation would show a gun in Destin Thomas's hand.

A.  Okay. I'll look, but I don't believe we have -- let me look here.

No, there is no representation throughout the animation model of Destin Thomas having a gun in his hand.

Q.  Why is that?  You agreed with me that he had a gun in his hand when he came out the apartment, correct?

A.  I do agree with you that he had a gun in his hand when he came out of the apartment, correct.

Q.  Then why don't -- why don't you have it in your animation?

A.  Well, it's a frozen moment in time. I would – I would concede to you that in that historical image of Destin Thomas at the far left of the screen at this particular time point he should have an animation -- I'm  sorry -- he should have a gun in his hand at that particular point in time. I'll concede that.

14

(ECF No. 35-8, at Page ID # 824-25.)

Roder offered his opinion on when Thomas likely ceased holding the gun:

> Q.  Okay.  When did the gun leave Destin's hand?
>
> . . .
>
> THE WITNESS: Well, it's probable that the gun left Destin's hand somewhere between the first and second shot.

(ECF No. 35-8, at Page ID # 805.)  Roder attempted to explain the basis for his perceived calculation of the probabilities:

> Q.  But you don't know that for sure, right?
>
> A.  Well, I mean, you know, I don't know that for sure, but I think there's a probability there, that either prior to both shots or between shots one and two that the gun was most likely in the position on the ground there.

(ECF No. 35-8, at Page ID # 805.)  Roder later testified as to his use of the word "probable":

> Q.  You used the word "probable" in this -- in describing some portions of your animation.  You're saying it was probable that such-and-such was the case.  I just want you to explain what you meant by the word "probable."
>
> A.  Well, I mean more probable than not.  I mean that it is a scenario that fits the physical evidence and -- and is a probable scenario based in physical evidence, a sound methodology that can be put forth as a representation of what happened.  So I'm not saying it's exactly what happened, but what I am saying is that it's probable, more probable than not.

(ECF No. 35-8, at Page ID # 855.)  As discussed below, reliance on such probabilities is insufficient.

Roder also testified as to his belief that Destin Thomas was not likely holding a gun when he was killed:

> Q.  Now, you have Destin's arms down in this image [in the animation], correct?

A.  Yes, yeah.

Q.  Both in the blue figure and the gray figure, correct?

A.  That's correct, yeah.

Q.  And there's no gun in his hand, correct?

A.  Well, I don't believe the gun was in his hand.

Q.  Why?  What evidence do you have that indicates that?

A.  Well, I believe there's a number of pieces of evidence that indicate that. But once again, you have to look at the bigger picture, what I would call the totality of the evidence, and it starts with the 911 call.  So Destin Thomas is, by all definitions, the victim of a burglary and a hostage, and he's going out to the curb to meet the police officer that he's on the phone with.  Well, he's on the phone with 911.  He's calling the police to the scene.  So you start with that premise, that he's coming out to meet the police officers.

And then we've got additional evidence that, you know, that shot to the chest was between three and four feet.  And the medical examiner specifically states that there's a well-defined disbursement of gunshot residue around that bullet, right? Which means that that was the intermediate range shot muzzle to target.  So one would think that if that gun in his right hand was outstretched toward the officer, that that gun would be considerably closer than three to four feet from muzzle to target, and you may expect to find some additional gunshot residue even on the gun.

And then the other item would be the gun itself, where it was found and the fact that there was blood all over the side of the gun that was facing up, including blood on the handle of the gun.  If the gun was being handled at the time the shots were discharged, which would also precipitate immediate bloodletting, you would also expect to see either smudged blood or a lack of blood on the handle of the gun, which you don't see that here.  So, you know, I think that it's probable that this is what fits the physical evidence.

Q.  Is there any scientific basis for your belief that the gun was not in Destin's hand at this point in time?

A.  Well, I think I just gave you at least two points relative to a scientific basis.

Q.  Are you an expert in either of those fields?

16

      A.  I'm not a blood spatter expert or a ballistician.

(ECF No. 35-8, at Page ID # 820-22.)  In fact, Roder testified at his deposition that he was not a

forensic scientist, that he was not an expert on blood patterns, that he was not an expert in

trajectory analysis, and that he was not an expert in ballistics.  He testified that he "shouldn't say

no" when asked whether he was a gunshot residue expert because it was up to the Court to

decide.  (ECF No. 35-8, at Page ID # 829.)  Roder also testified that he was not offering a

ballistics opinion and that he had not offered a written opinion on the trajectory of the bullets.

      Roder nonetheless repeated his opinion on when he believed Thomas stopped holding the

gun:

      Q.  Okay.  At what point in time do you believe the
gun was no longer in his hand?

      A.  Sometime either just before or during the shooting sequence.

      Q.  Okay.  At what point during the shooting sequence?

      A.  Like I said, either just before the shooting started, meaning just before,
or between shots one and two.

(ECF No. 35-8, at Page ID # 825-26.)  Roder then testified:

      Q.  To the best of your knowledge, Destin had a gun just before the first shot;
would you agree?

      A.  I would agree.

      Q.  And that's not depicted in the animation either, correct?

      A.  No, it's not depicted in the modeling that we have here of these two
moments in time.

(ECF No. 35-8, at Page ID # 827.)

      Despite an arguable proclivity for offering opinions, Roder testified that he was not

opining on whether a constitutional violation had occurred or whether Kaufman had violated any

police department policies or procedures.  Additionally, he testified as follows:

> Q.  You're not rendering any opinion as to whether Officer Kaufman
> perceived risk of physical harm at the time he fired his weapon, are you?
>
> A.  No.

(ECF No. 35-8, at Page ID # 834.)

None of the foregoing testimony presents a genuine issue of material fact over whether

Thomas pointed a gun at Kaufman.  Roder cannot opine on this; his animation and opinions are

based on assumptions conflated with data, all of which he is interpreting.  In addition to not

being an expert capable of asserting several of the opinions he offers, any inference based on

Roder's testimony related to the ultimate issue here–whether Thomas pointed a gun at

Kaufman–simply has no actual evidentiary basis.  *See Boyd v. Baeppler*, 215 F.3d 594, 602 (6th

Cir. 2000) (rejecting a plaintiff's "counter-narrative" that a suspect was not carrying a gun

because that narrative was "not based on substantial and material evidence").  Moreover,

Roder's characterization of his belief as based on the probability involved is insufficient to

present a genuine issue of material fact; it is well settled that a "report . . . based upon

probabilities only, [is] essentially a matter of speculation." *Id.* at 604.  *See also id.* at 603

(holding that the speculation of a plaintiff's experts was insufficient to create a genuine issue of

material fact when the expert "made assumptions about the sequence of shots and the pathways

of the bullets and concluded, not within a reasonable degree of medical certainty, but only 'with

probability,' that a more likely scenario was that" the suspect was unable to point a gun at an

officer).

The dearth of evidence supporting Plaintiff's arguments leaves only the uncontroverted

18

facts.  The crime involved here was a burglary in progress–an active home invasion scenario–which presents a crime of notable severity.  In the heat of the moment, Thomas appeared to pose an immediate threat to the safety of Kaufman, as well as potentially others, and Thomas appeared to be actively resisting arrest or attempting to evade arrest by flight–and, more significantly, by pointing a gun at Kaufman and thereby presenting a clear risk of physical harm.

The United States Supreme Court has held that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).  Thus, the Supreme Court explained, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* The events here could be perceived as falling within this capture-a-dangerous-suspect holding.

These same events also fall under a simple risk-of-serious-harm analysis.  Under this analysis, the issue is not whether Thomas was fleeing, but whether he pointed the gun at Kaufman so as to pose an immediate threat of harm.  This scenario is akin to the facts of *Boyd v. Baeppler*, 215 F.3d 594 (6th Cir. 2000).  In that case, a suspect was holding a gun while running toward officers.  The suspect disobeyed an order to stop and pointed the gun at the officers, who shot the suspect.  Here, Thomas was running toward Kaufman and pointed his gun at the officer. There was no order to stop, but in the moment Kaufman reasonably perceived that a suspected home invader was pointing a gun at him, presenting an immediate threat of serious physical harm, including potential death.

19

The reasonableness of Kaufman's use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.   Deference to Kaufman's on-the-spot judgment about the level of force necessary in light of the circumstances confronting him is therefore warranted.  This deference and the objectively reasonable perspective leads to only one logical conclusion, and that is that Kaufman acted reasonably, with his reasonable action resulting in a tragedy.

In light of the foregoing and cognizant of the applicable summary judgment standard that controls today's analysis, this Court can only agree with Kaufman that summary judgment is proper.  The Sixth Circuit has cautioned that "[s]ummary judgement on a claim of excessive force is inappropriate where the parties dispute virtually all of the essential facts surrounding the excessive force claim because it impossible to determine whether the force used was reasonable without choosing between the parties sharply different factual accounts."  *Jackson v. Hoylman*, 933 F.2d 401, 403 (6th Cir. 1991).  This is not the case here.  Despite contrary speculation, there is no actual factual dispute as to whether Thomas pointed a gun at Kaufman, which means that there is no constitutional violation and that application of qualified immunity is warranted.  Plaintiff has therefore failed to present an excessive force claim that can survive summary judgment.

### 2. *Deliberate indifference claim*

Plaintiff also asserts a § 1983 claim against Kaufman based on the officer's alleged deliberate indifference to Thomas' serious medical needs.  Plaintiff's theory is that the Fourteenth Amendment required Kaufman to provide adequate medical care to Thomas after the shooting and before the medical personnel arrived.  The parties' dispute is over whether

20

Kaufman summoning an ambulance was sufficient or whether the Constitution required more.

The Sixth Circuit has explained that "[t]he Due Process Clause of the Fourteenth Amendment requires government officials to provide adequate medical care to individuals injured while being apprehended by the police." *Scozzari v. Miedzianowski*, 597 F. App'x 845, 848 (6th Cir. 2015) (citing *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). It is well settled that "[t]o establish a violation of the right to adequate medical care under 42 U.S.C. § 1983, a plaintiff must show that the defendant acted with 'deliberate indifference to serious medical needs.' " *Id.* (quoting *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001)). What is required is a reckless disregard of a substantial risk of serious harm. *Id.* Thus, a deliberate indifference claim " 'requires that the defendant[] knew of and disregarded a substantial risk of serious harm to [the plaintiff's] health and safety.' " *Linden v. Piotrowski*, 619 F. App'x 495, 500 (6th Cir. 2015) (quoting *Watkins*, 273 F.3d at 686). Given the obviousness of the seriousness of the medical need, the objective component of this claim is not at issue here. What is at issue is the subjective component of the claim, which requires that Kaufman perceived facts from which to infer a substantial risk to Thomas, that Kaufman did in fact draw that inference, and that Kaufman then disregarded that risk. *See id.*

Here, Kaufman met his constitutional duty when he summoned medical personnel. Following the shooting, Kaufman abandoned his pursuit of a suspect to return to Thomas, called for a medic within one minute of the shooting, and took cover to wait for the medic and backup officers because he "could not be certain of who was inside the apartment, or who was in the immediate area." (ECF No. 32-1, at Page ID # 129 ¶ 19.) Notably, Kaufman has indicated that when he "returned to the location . . . Thomas was lying on his back in front of the apartment

and appeared, to me, to be dead." (*Id.*) Kaufman states in his affidavit that he "was unaware of any medical assistance I could possibly provide." (*Id.*)

These facts do not present a case in which an officer interrupted the provision of medical treatment. *See id.* at 850. This is also not a case in which an officer delayed requesting medical personnel and then held the ambulance back from reaching the individual in need of attention. *Scozzari v. City of Clare*, No. 08-10997, 2013 WL 317828, at *8 E.D. Mich. Jan. 28, 2013). And it is not a case in which an officer failed to summon or provide an injured person with medical care and simply stood by. *See Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 600 (6th Cir. 2005). Rather, this is a case in which an officer, present at a still-active, unsecured crime scene with one or more individual suspects unaccounted for, took cover and summoned medical personnel but did not attempt to provide medical care to a man he believed to be dead. The Constitution requires reasonableness, not that an officer put himself at risk to provide what appears to be futile aid. Plaintiff has directed this Court to no precedent that established at the time of the events involved that an officer is constitutionally compelled to engage in such conduct.

This is not to say that, "in any and all circumstances, an officer need never do more than summon medical help to avoid being found deliberately indifferent to a serious medical need." *Eibel v. Melton*, 904 F. Supp. 2d 785, 807 (M.D. Tenn. 2012). The case law directs otherwise, and but for an active crime scene being involved, presenting a risk of injury to Kaufman by one or more still at-large suspects, and but for the fact that Thomas appeared already dead, Kaufman would likely fall within the precedent that would have required an attempt to provide and not merely summon medical aid. The distinguishing components identified here place Kaufman

22

outside the clearly established constitutional obligations; there is no rule that should have compelled him to do more than he did.  Kaufman is entitled to summary judgment on the deliberate indifference claim.

### 3. *Monell claims*

Plaintiff asserts two § 1983 claims against the City of Columbus and Jacobs in her official capacity, one for failure to train and for having customs, policies, or practices causing constitutional violations and one for ratification.  The Sixth Circuit has explained that "[t]he question of whether a municipality is liable under § 1983 has two parts: '(1) whether [the] plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible of that violation.' "  *Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 449 (6th Cir. 2011).

The remaining § 1983 claims fail for want of a predicate violation.  As a general proposition, where an underlying claim against an officer fails, a *Monell* claim against that officer's employer necessarily fails as well.  *Lee*, 432 F. App'x at 450 (holding that because a jury found that an officer had not engaged in excessive force, the jury was prohibited from considering the *Monell* claim against the municipality).  Because the underlying excessive force and deliberate indifference claims fail for want of a deprivation fo a constitutional right as discussed above, the contingent § 1983 claims also fail.  *See Henderson v. Reyda*, 192 F. App'x 392, 398 (6th Cir. 2006) (holding that the dismissal of underlying claims against an officer compelled the failure of the *Monell* claims against the county employer).

The *Monell* claims also fail because Plaintiff has wholly failed to point to any requisite policy, custom, or action needed to create municipality liability.  *Monell v. Dep't of Soc. Servs.*

23

*of City of New York*, 436 U.S. 658, 690, 694 (1978).  Taylor's deposition testimony in fact places the policies and procedures within acceptable standards.  The City of Columbus and Jacobs are therefore entitled to summary judgment on these last federal claims.

### 4.  *State law claims*

Plaintiff also asserts state law claims against Defendants for assault and battery, intentional infliction of emotional distress, and wrongful death.  In light of the failure of Plaintiff's federal claims, this Court should presumptively not address these state law claims. *See Jackson v. Heh*, 215 F.3d 1326, 2000 WL 761807, at *8 (6th Cir. 2000) (unpublished table decision) (referencing 28 U.S.C. § 1367 and stating that " [w]here, as here, a federal court has properly dismissed a plaintiff's federal claims, there is a 'strong presumption' in favor of dismissing any remaining state claims unless the plaintiff can establish an alternate basis for federal jurisdiction." (citing *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1255 (6th Cir. 1996))).

Here, Plaintiff has failed to assert any justification or alternative basis for exercising jurisdiction over the remaining state law claims should the federal claims fail.  Thus, while expressing no opinion on the merits of the state law claims, the Court dismisses the claims for assault and battery, intentional infliction of emotional distress, and wrongful death without prejudice.  *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) ("If the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); *Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001) ("the usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment").

### III.  Conclusion

The Court **GRANTS** Defendants' motion for summary judgment in regard to Plaintiff's federal claims.  (ECF No. 32.)  This Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, which the Court **DISMISSES WITHOUT PREJUDICE**.  The Clerk shall enter judgment accordingly and terminate this case on the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

**IT IS SO ORDERED.**

_____/s/ Gregory L. Frost_____
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE

25